```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF KENTUCKY
```
**CENTRAL DIVISION at LEXINGTON**

```
3D ENTERPRISES CONTRACTING    )
CORPORATION,                  )
                              )   Civil Action No. 07-80-JMH
      Plaintiff,              )
                              )
                              )
v.                            )
                              )   MEMORANDUM OPINION AND ORDER
NATIONAL ELECTRIC COMPANY, INC,)
                              )
      Defendant.              )

              **    **    **    **    **
```

This matter is before the Court on Plaintiff's motion for partial summary judgment [Record No. 50] and Defendant's motion for full summary judgment [Record No. 47]. The matter being fully briefed, it is now ripe for review.

### I. Factual Background

Plaintiff 3D Enterprises Contracting Corporation ("3D") is a general construction contractor which constructs, among other projects, wastewater and water treatment plants for municipalities, counties and utility districts. Defendant National Electric Company, Inc., ("NEC") is in the business of performing electrical work. In late 2006, 3D was in the process of formulating a bid to submit to the Hallsdale-Powell Utility District for work on the Beaver Creek Wastewater Treatment Facility Expansion-Contract 2 ("the Project").

On December 12, 2006, 3D solicited a quote for electrical work on the Project by sending NEC the proposed version of the scope of electrical work required for the Project. 3D representative Wes

Harris ("Harris") and NEC representative David Jones ("Jones") discussed the form of the subcontract, with NEC requesting an American Institute of Architects ("AIA") or industry standard subcontract form.  3D indicated that it used its own subcontract form.  On December 14, 2006, NEC submitted a bid to 3D offering to perform the electrical work for the Project.  The bid stated that NEC would honor the price for seventy-five days, but contained no mention that the price was contingent upon the use of an AIA or industry standard subcontract form, as opposed to 3D's own form, which 3D had previously represented to NEC would be used for the Project.  3D utilized NEC's bid in preparing its own bid for the Project, which was also submitted December 14, 2006.

3D was the successful bidder on the Project, a fact which 3D made known to NEC on December 14, 2006, via a telephone call from a 3D representative to Jones at NEC.  Jones testified that upon receiving the phone call, he understood that 3D intended to enter into a subcontract with NEC for the electrical work on the Project. (Jones Dep. p. 125, ll.5-8).  On February 13, 2007, 3D submitted its subcontract form to NEC, and a meeting between parties was scheduled for February 16, 2007.  The project management teams for both parties attended the meeting in Lexington, Kentucky.

By letter dated February 23, 2007, NEC indicated that it may not enter into a subcontract with 3D to perform the electrical work on the Project, due to differences in the scope of work and objections to 3D's subcontract.  In a March 2, 2007 letter, 3D reminded NEC that NEC was informed prior to making its bid that 3D

2

would use its own subcontract form for the Project. NEC confirmed its refusal to perform the electrical work on the Project by letter dated March 6, 2007. Thereafter, 3D retained another electrical subcontractor for the Project, at a cost of approximately $570,000 higher than NEC's bid. 3D seeks to recover this difference in price, along with other costs incurred as a result of NEC's refusal to perform. 3D seeks recovery under a theory of promissory estoppel.

## II.  Standard of Review

A grant of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden is met simply by showing the court that there is an absence of evidence on a material fact on which the nonmoving party has the ultimate burden of proof at trial. *Id.* at 325. The burden then shifts to the nonmoving party to "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). A material fact is one that may affect the outcome of the issue at trial, as determined by substantive law. *Celotex*, 477 U.S. at 325.

When determining if summary judgment is proper, the Court's

3

function is not to weigh the evidence, but to decide whether there are genuine factual issues for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Multimedia 2000, Inc. v. Attard*, 374 F.3d 377, 380 (6th Cir. 2004). A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows "that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004). The evidence should be construed in the light most favorable to the nonmoving party when deciding whether there is enough evidence to overcome summary judgment. *Anderson*, 477 U.S. at 255; *Summers*, 368 F.3d at 885. While this Court must draw all inferences in a light most favorable to the plaintiff, summary judgment may be granted "if the record, taken as a whole, could not lead a rational trier of fact to find for [the plaintiff]." *McKinnie v. Roadway Express*, 341 F.3d 554, 557 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### III. Analysis

While alerting the Court to a potential choice of law issue, the parties agree that both Tennessee and Kentucky have adopted the definition of promissory estoppel found in the Restatement (Second), Contracts § 90. Defendant points to *Shedd v. Gaylord Entm't Co.*, 118 S.W.3d 695 (Tenn. Ct. App. 2003) as evidence of Tennessee's strict application of the doctrine of promissory estoppel. *Id.* at 700 ("the Tennessee Supreme Court has taken a

4

more restrictive view, limiting the application of promissory estoppel to exceptional cases"). This Court finds that any conflict of law would be a false conflict, as the end result in this case would remain the same. As both parties rely on Kentucky law to support their arguments, the Court will do the same.

As this Court previously stated, "[t]he doctrine of promissory estoppel, as adopted by Kentucky Courts, is as follows: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. "" *Rotondo Weirich Enter., Inc. v. Rock City Mechanical, Inc.*, No. 0:05cv73-HRW, 2006 U.S. Dist. LEXIS 19177 (E.D. Ky. April 11, 2006) ( *quoting* Restatement (Second), Contracts §90). This Court finds instructive *Harry Harris, Inc. v. Quality Constr. Co.*, 593 S.W.2d 872 (Ky. Ct. App. 1979), in which the court affirmed an award in favor of the general contractor under the theory of promissory estoppel. The subcontractor in *Harry Harris* withdrew its quote and refused to perform upon realizing it had made a mistake in preparing its bid. The court held that "[a] subcontractor may not withdraw its bid to a general contractor after the general contractor's bid had been submitted to and accepted by the owner using the bid of the subcontractor." *Id.* at 874. Similarly, in *Meade Constr. Co. Inc., v. Mansfield Commercial Elec., Inc.*, 579 S.W.2d 105 (Ky. 1979), Kentucky's highest Court held that a subcontractor who submitted a bid to a general contractor and knew that the general relied on the

5

bid in preparing its own bid for the project was liable for damages caused by its refusal to honor the bid.

In ruling that the plaintiff in *Rotondo Weirich* had no promissory estoppel claim against defendant Rock City Mechanical, Judge Wilhoit distinguished *Meade* and *Harry Harris*, emphasizing that in both cases, there were "unequivocal communication[s] of acceptance to the subcontractor, soon after the awarding of the contract to the general." This Court finds Judge Wilhoit's emphasis on the communications between a general and subcontractor to be instructive in the instant case. On the very day that 3D learned it was the low bidder on the Project, 3D informed NEC of that fact and the fact that 3D had utilized NEC's bid in 3D's bid on the Project. Jones testified during his deposition that upon receiving that phone call on December 14, 2006, he knew that 3D intended to enter into a subcontract with NEC for the electrical work on the Project. (Jones Dep. p. 125, ll.5-8). 3D relied on NEC's bid, a fact which the NEC representative working on the Project bid fully admits he knew would occur. Unlike the general contractor in *Rotondo Weirich*, who waited approximately nine months before sending a contract to the subcontractor, 3D sent a contract to NEC on February 13, 2006, approximately sixty days after it notified NEC that it would be the electrical subcontractor. The subcontract was sent to NEC well within the seventy-five day period during which the prices in NEC's bid were valid. 3D did not tarry, as did the general contractor in *Rotondo Weirich*.

NEC emphasizes that prior to submission of its bid, there were

6

conversations between NEC and 3D regarding the type of subcontract form to be used. NEC postulates that because it indicated to 3D prior to its bid that NEC would require an AIA or industry standard subcontract form, that 3D's reliance on NEC's bid was not reasonable, as 3D intended to use its own subcontract form. The Court is not persuaded. Although there were discussions regarding the type of subcontract to be used on the Project, no agreement was reached. As NEC's Project representative admits, 3D did not assure NEC that it would receive an AIA or industry standard subcontract. (Jones Dep. p. 118, ll.19-25). Jones also admitted that at the time NEC's bid was submitted to 3D, NEC understood that 3D was intending to use its own subcontract form. (Jones. Dep. p. 121, ll. 11-15). Jones testified that while he had the option of noting on NEC's bid that it was contingent upon the use of an AIA or industry standard contract, he decided against it. (Jones Dep. p. 120, ll.7-19). Upon receiving the bid from NEC with no indication that it was contingent upon the use of an AIA or industry standard contract, 3D acted reasonably in relying on NEC's bid. 3D's reliance was to its detriment to the tune of several hundred thousand dollars which 3D expended in obtaining another electrical subcontractor once NEC refused to perform.

In addition to stating that it refused to perform because of the subcontract form, NEC cites differences in scope of work as a reason for its refusal. The Court finds that any differences in scope were insufficient to justify NEC's refusal to perform. A March 13, 2007 letter from Don Myers, Executive Vice President of

7

3D, to David Jones of NEC stated: "As I have indicated to you in 3D's letter, dated March 2, 2007, and in our telephone conversation on March 9, 2007, it was never 3D's intention to hold National Electric Company (NEC) responsible for work that was not included in their proposal." This statement is supported by testimony that with respect to the three disputed scope elements, one was remedied by 3D providing the items, and another could be remedied by 3D performing the work itself, instead of requiring the work of NEC. (Myers Dep. pp. 66-69).

As Gary Clayton, secretary/treasurer of NEC admitted, "[d]ifferences in scope are not that uncommon," and such insignificant differences as those which existed in this case do not justify NEC's refusal. Despite claiming that it refused to perform because of, *inter alia*, differences in scope, NEC fails to pinpoint any work item which it excluded from its proposal that it would have been required to perform under 3D's subcontract. Any differences in scope appear to simply be differences in the way the two parties described the scope. Knowing there were unresolved differences in scope, NEC submitted its bid. NEC knew 3D relied on NEC's bid. For NEC to now point to minor differences in scope as justification for its failure to perform is disingenuous. The parties admit that minor differences in scope are common, thus 3D's reliance on NEC's bid was reasonable.

### IV. Conclusion

Accordingly, and for the foregoing reasons,

**IT IS ORDERED:**

8

1.)  That Plaintiff's motion for partial summary judgment [Record No. 50] be, and the same hereby is, **GRANTED**;

2.)  That Defendant's motion for full summary judgment [Record No. 47] be, and the same hereby is, **DENIED**; and

3.)  That the parties shall contact Magistrate Judge Todd to schedule a settlement conference to address the issue of damages.

This the 18th day of January, 2008.

**Signed By:**
*Joseph M. Hood*
**Senior U.S. District Judge**